840 So.2d 115 (2002)
Ex parte John Olyn TABOR, Jr.
(In re John Olyn Tabor, Jr. v. Tresa Livingston Tabor Buxton).
1010043.
Supreme Court of Alabama.
June 7, 2002.
*116 Blanchard L. McLeod, Jr., Selma; and P. Vaughan Russell of McCormick & Russell, Selma, for petitioner.
Charles H. Sims III, Selma, for respondent.
HARWOOD, Justice.
John Olyn Tabor, Jr., petitioned this Court for a writ of certiorari to review the judgment of the Court of Civil Appeals affirming the trial court's order requiring Tabor to pay child support and postminority support pursuant to Ex parte Bayliss, 550 So.2d 986 (Ala.1989). We granted Tabor's petition to consider whether the Court of Civil Appeals correctly affirmed the trial court's judgment in light of Tabor's arguments that the doctrines of equitable estoppel, judicial estoppel, or res judicata prevented Tresa Livingston Tabor Buxton, Tabor's former wife, from claiming child support and postminority support under Bayliss, supra. We affirm in part, reverse in part, and remand.
The trial court, in a March 10, 2000, order entered after an ore tenus hearing, set out the underlying facts of this action, as follows:
"[Tabor and Buxton] were divorced in 1983 and entered into a Separation Agreement which was attached to the original Divorce Decree. At that time [Buxton] was awarded the care, custody, and control of the minor children of the parties, [a son and a daughter].
"... [Visitation] with [the minor children and Tabor] went well until the Fall of 1992. During December, 1992, [Tabor] filed a Petition for Rule Nisi, Petition for Modification or in the Alternative, Petition for Custody of the minor children.... [I]t was at this time that the relationship between the parties deteriorated and that the relationship between the minor children and [Tabor] deteriorated as well.
"... [Buxton] attempted to seek the Court's assistance in payment of child support from [Tabor], but was unsuccessful in obtaining an Order from the Circuit Court or the District Court of Dallas County, requiring the support to be paid by [Tabor].
"Finally, in December, 1993, almost 12 months after the filing of the Rule Nisi Petition, the Circuit Court rendered an Order signed by then Acting Circuit Judge William A. Ryan, indefinitely suspending the parental rights and responsibilities of [Tabor], forgiving the child support arrearage if any existed, and further suspending the obligation of support by [Tabor] to the minor children."
The December 10, 1993, order that suspended Tabor's parental rights and responsibilities and his obligation to pay child support for his minor children stated:
"This Court in continuing this case for trial confirms the pendente lite agreement of the parties reached during a prior assignment of this case and in so doing finds and ORDERS the following:
"1. That as of the time of the filing of the petition in this cause, neither party is indebted to the other party for child support.
"2. That the parental rights and responsibilities of [Tabor] are indefinitely suspended in view of the extreme deterioration of the relationship of the parties and the desire of this Court to preserve any remaining opportunities to restore the erstwhile good relations between the parties.

*117 "3. Nothing in this Order shall prevent the voluntary undertaking and support and visitation by the parties, but none shall be prescribed by this Court pendente lite.
"4. A copy of this Order shall be filed by the Clerk in Dallas County Case No. DR-83-179.02 to allow that Court to know that this `.01' proceeding remains pending before this Court, thereby depriving such Court of any jurisdiction in this matter as claimed in a subsequently filed `.02' proceeding.
"5. At the request of Mr. Faile, counsel for [Buxton], this matter is continued for the first term of this Court, 1994."
On August 10, 1995, the trial court entered an amended order that stated:
"THIS CAUSE, having come before the Court upon the parties' Motion to Deem the Pendente Lite Decree a Final Order, and the same having been considered by the Court, it is
"ORDERED, ADJUDGED, and DECREED that the Pendente Lite Decree previously entered by this Court dated the [10th] day of December, 1993, shall be deemed a Final Order, and that the above-captioned matter shall be removed from the Administrative Docket."
On June 24, 1999, Buxton filed a complaint against Tabor seeking child-support payments and postminority support for their daughter, who was 18 years old at the time. Their oldest child, a son, had already reached the age of majority. The complaint stated, in pertinent part:
"2. That heretofore by that certain Divorce Decree dated August 9, 1983, the parties hereto were divorced and in said Decree [Tabor] was Ordered to pay certain sums in child support. That by virtue of that certain Pendente Lite Order dated December [10], 1993, the parental rights and responsibilities of [Tabor] were indefinitely suspended, but a further part of said Order stated that the parties were not prevented from the [voluntary] undertaking of support and visitation. This Pendente Lite Order was made a final Order on August 10, 1995. The minor children were not represented by a Guardian Ad Litem in any of said Orders."
Buxton's complaint also requested the following relief:
"1. That this Court will appoint a Guardian Ad Litem to represent the interest of [the son] and [the daughter] in this cause.
"2. That this Court will determine whether or not the Pendente Lite Order relieving [Tabor] from paying child support is valid as to the children because they were not represented by a Guardian Ad Litem and on the determination of that issue, will decide whether or not past due child support is ordered at this time.
"3. That this Court will Order [Tabor] to pay child support for [the daughter] until she attains the age of nineteen years, or dies, or marries, or becomes self sustaining, and in that event, child support payments as to that child shall cease and terminate.
"4. That this Court will determine that [the daughter] has the aptitude and ability to attend college, and will Order [Tabor] to pay a portion of said college educational expenses under the law set forth in the Bayliss case of the State of Alabama.
"5. Should [Buxton] be mistaken in the relief prayed for, that [she] be granted such other, further, different and general relief to which [she] may be entitled under the facts and the law of this case."
*118 On September 1, 1999, Tabor filed an answer that stated, in pertinent part:
"3. [Tabor] answers that both the pendente lite order of December 17, 1993[sic], and the Final Order of August 10, 1995, were put forward to the Court by [Buxton] who had sought to terminate the rights and responsibilities of [Tabor] regarding the then minor children of the parties. [Buxton], while represented by very competent counsel, put forward to this Court both the pendente lite order and the final order of support which for all practical purposes granted [Buxton]'s wish that [Tabor] end his association with his minor children at the request of [Buxton] and [at] the request of the minor children of the parties who met in camera with the Judge presiding in such case who in all respects protected the interests of the minor children of the parties in lieu of a guardian ad litem.
"4. [Tabor] further answers that he was at all times opposed to this [disassociation] and that [Buxton] insisted upon the same and was relentless in her pursuit thereof.
"5. [Tabor] further answers that [Buxton] is estopped from asserting that claim made under the terms of this Complaint. She hasin all probabilitypermanently interrupted the father/child relationship as she sought to do in the prior proceeding involving these parties and their minor children and now that such has been fully accomplished, she seeks to impose responsibilities upon [Tabor] which he cannot bear.
"....
"7. Further, [Tabor] answers that he cannot afford to contribute to the college education of the [daughter] in that he is the sole supporting parent of six children including four children who have special and/or multiple needs....
"8. [Tabor] further answers that despite [Buxton]'s offer to `do equity' that she has not done so and could have reasonably anticipated that [Tabor] having been `shut away' from the children that he fathered by [Buxton] would seek to remarry and act as a good and proper father to the children now in his care, custody and control."
On January 21, 2000, the trial court conducted a hearing on Buxton's complaint. On March 6, 2000, it entered an order that contained the following findings:
"The Court, based upon the testimony of the parties and the law as submitted to the Court by the attorneys, finds that the Court Order of December [10,] 1993, wherein [Tabor]'s parental rights and responsibilities were indefinitely suspended, and further forgiving [Tabor] of any obligation of support in the future or for arrearage, is due to be set aside. This Court would cite the case of State ex rel. Donald Shellhouse v. Wanda Bentley, 666 So.2d 517[, 518] (Ala.Civ. App.1995), wherein the Court stated that,
"`The waiver of rights of visitation in exchange for release from the duty of child support is a legal impossibility.'

"Willis v. Levesque, 402 So.2d 1003, 1004 (Ala.Civ.App.1981).
"The Court further stated,
"`Parental support is a fundamental right of all minor children. It is a continued right, which cannot become stale until after the child reaches the age of majority. The right of support is inherent and cannot be waived, even by agreement.'
"[666 So.2d at 518.] The Court went on to state in Shellhouse that,
"`The custodial parent cannot agree to forgive the amount due under a child support arrearage, and the parent *119 cannot waive child support due under a court order.'
"[666 So.2d at 518.]
"The Court finds that the Order of December 10, 1993, is in violation of these basic rules of law regarding child support and the parental obligations. However, the Court finds that [Buxton] does not have a right to seek child support arrearage for the [son] due to the fact that this child has reached the age of majority, and therefore, this claim has become `stale.'
"With regard to the issue concerning postmajority education expense, the evidence elicited at Trial was that the [daughter] currently attends George C. Wallace Junior College in Selma, Alabama, where she was enrolled during the Winter Term, 2000. [The daughter] and Mrs. Buxton have incurred expenses in connection with tuition, books, and other fees in the amount of $850; $750 tuition, $100 books. The testimony indicated that [the daughter] worked part time at a local photography shop, and earned approximately $5.25 per hour. She averaged 30 hours per week during 1999, and submitted to the Court a W-2 Form reporting total wages of $8,029.59 for 1999. These wages are used by [the daughter] for incidental expenses including supplementing expense for transportation costs.
"The undisputed testimony established that Mrs. Buxton's salary with a local dentist was $30,000 annually, and Mr. Tabor, who is employed by Mercedes in Bibb County, Alabama, earned $21.53 per hour, with annual income of $72,000 for 1999.
"Based upon the testimony and the respective parties' ability to pay, [Tabor] is ORDERED to pay in accordance with Ex parte Bayliss, two-thirds of tuition, books, and fees incurred by [the daughter] per semester.
"The Court finds that the Petition for Modification is due to be granted and that [Tabor] is ORDERED to pay to the Circuit Court of Dallas County, Alabama, the sum of Six Hundred Forty-Three Dollars ($643.00) per month, effective January 1, 2000, for the maintenance and support of [the daughter]. Said support shall continue until the minor attains the age of majority, dies, or becomes self sustaining."
On April 7, 2000, Buxton filed a postjudgment motion to amend, alter, or vacate the order or for a new trial, arguing in part, that the trial court erred in not ordering Tabor to pay past-due support payments for the parties' son and that the trial court should have specifically determined the amount Tabor was in arrears for past-due child support. On that same day, Tabor also filed a postjudgment motion; that motion sought a rehearing, the correction of a scrivener's error in the order, or a new trial, arguing that the trial court had failed to take into consideration when it calculated the child-support payment he was due to pay for the parties' daughter the fact that he had ongoing obligations to his other six minor children.
On May 18, 2000, Buxton filed a motion to hold Tabor in contempt for failure to pay his portion of the daughter's educational expenses and for failure to make child-support payments for the months of January 2000 through April 2000. On September 25, 2000, Tabor supplemented his motion for a new trial by asserting that the trial court's order was due to be reversed based on the doctrines of equitable estoppel, judicial estoppel, laches, and res judicata. On September 28, 2000, the trial court entered an order denying Tabor's postjudgment motions and denying Buxton's postjudgment motion with the exception *120 that the trial court determined that Tabor did owe past-due child support in the amount of $25,284.
On November 7, 2000, Tabor filed a notice of appeal to the Court of Civil Appeals. On June 22, 2001, the Court of Civil Appeals affirmed the trial court's judgment, without an opinion, citing Rule 53(a)(1) and (a)(2)(F), Ala. R.App. P.; Ex parte State ex rel. Lamon, 702 So.2d 449 (Ala.1997); Ex parte Perkins, 646 So.2d 46 (Ala.1994); McLemore v. Fleming, 604 So.2d 353 (Ala.1992); State ex rel. Pritchett v. Pritchett, 771 So.2d 1048 (Ala.Civ. App.2000); State ex rel. Shellhouse v. Bentley, 666 So.2d 517 (Ala.Civ.App.1995); Frasemer v. Frasemer, 578 So.2d 1346 (Ala.Civ.App.1991); and Davis v. State ex rel. Sledge, 550 So.2d 1034 (Ala.Civ.App. 1989). Tabor v. Buxton (No. 2000191), 837 So.2d 335 (Ala.Civ.App.2001) (table).
Tabor argues that the Court of Civil Appeals erred by affirming the judgment of the trial court because, he says, the doctrines of equitable estoppel, judicial estoppel, and/or res judicata prevented Buxton from claiming payments for child support and postminority support under Bayliss.
The trial court's March 6, 2000, order set aside its 1993 order that had adopted the parties' pendente lite agreement. Because the trial court's 1995 order made its 1993 order final, we note that the trial court also necessarily set aside its 1995 order. After a review of the authorities cited by the parties, the trial court, and Court of Civil Appeals, we conclude that none of those authorities support the proposition that the 1993 and 1995 orders were due to be set aside.
In Morgan v. Morgan, 275 Ala. 461, 156 So.2d 147 (1963), the parties had divorced, and pursuant to a court order, the father was ordered to pay $20 per month in child support. At some point in time, the father ceased making his court-ordered payments. The issue presented to this Court was whether an agreement between the parties relieved the father of his court-ordered support obligation. This Court stated: "The parents are without any warrant in law to later nullify [a valid divorce judgment] by mutual agreement between themselves .... Such agreements are without consideration, and void as a matter of public policy." 275 Ala. at 464, 156 So.2d at 150 (emphasis added). The parents' unratified agreement in violation of a prior, valid court order was held void.
In Barnes v. George, 571 So.2d 1217 (Ala.Civ.App.1990), the Court of Civil Appeals reiterated this same proposition of law, stating that "[i]t is a well-settled principle that a parent may not waive support payments due a minor child from the other parent under a decree of the court; neither may support provisions of the decree be nullified by agreement between the parents." 571 So.2d at 1219 (citing Mann v. Mann, 550 So.2d 1028 (Ala.Civ.App.1989), and Morgan, supra) (emphasis added). Similarly, in Willis v. Levesque, 402 So.2d 1003, 1004 (Ala.Civ.App.1981), the Court of Civil Appeals stated: "This court has held that the right to support of a child from its parents is inherent and cannot be waived by the parents even by agreement." (Emphasis added.) These cases clearly establish that parents may not enter into a binding agreement simply between themselves to waive or modify child support that has been previously ordered by a court. See McCreless v. McCreless, 673 So.2d 438, 440 (Ala.Civ.App.1995) ("The dispositive issue is whether the parties to a divorce action can subsequently modify the child support provisions of the judgment without court approval and ratification. That question has previously been answered in the negative."); Landers v. Landers, 481 So.2d 392, 393 (Ala.Civ.App. *121 1985) ("[T]he parents of a minor child cannot nullify nor modify a previous child support judgment by their mutual agreement without receiving the approval of the trial court to do so.")(citing Everitt v. Everitt, 279 Ala. 64, 181 So.2d 504 (1965), and Morgan, supra)(emphasis added); Phillippi v. State ex rel. Burke, 589 So.2d 1303, 1304 (Ala.Civ.App.1991)("A party may not unilaterally reduce child support payments without the consent of the court.")(citing Earheart v. Mann, 545 So.2d 85 (Ala.Civ.App.1989))(emphasis added).
Further, courts may not forgive child support already accrued and owing under a prior court order because "[c]ourt-ordered child support payments become final money judgments on the dates that they accrue and are thereafter immune from change or modification." Frasemer v. Frasemer, 578 So.2d 1346, 1348 (Ala.Civ.App.1991)(citing Motley v. Motley, 505 So.2d 1228 (Ala.Civ.App.1986)). Therefore, to the extent parties or trial courts agree to forgive past-due child support already owed under a specific court order, those agreements are due to be set aside.
However, Alabama cases are clear that court-ratified child-support agreements may prospectively modify support obligations. Indeed, courts frequently modify child-custody and child-support orders based on agreements between the parties. Rule 32, Ala. R. Jud. Admin., specifically contemplates judicial approval of parties' agreements. Rule 32(A)(2) states, in pertinent part, that "the court shall use the guidelines in reviewing the adequacy of child support orders negotiated by the parties." (Emphasis added.) See also Gautney v. Raymond, 709 So.2d 1279 (Ala.Civ.App.1998)(noting that the trial court's reduction of child support was based on an agreement of the parties approved by the court, but reversing on other grounds); State Dep't of Human Res. ex rel. Haney v. Haney, 568 So.2d 1231, 1231 (Ala.Civ.App.1990)("The parties then entered a temporary agreement, approved by the court, reducing support payments to $250 per month, with $90 per month representing child support."); Parnell v. Parnell, 500 So.2d 1137, 1139 (Ala.Civ.App. 1986)("If the parties reached an agreement which reduced the child support from $400 to $225 per month, the approval of the trial court should have been sought as to the matter, and, in the absence of a modification judgment to that effect, the husband was due to pay $400 each month as child support."); Grantham v. Grantham, 481 So.2d 902 (Ala.Civ.App.1985)(noting that the trial court ratified the parties' agreement, under which, among other things, child support was reduced). Certainly, Alabama trial courts have the authority to approve agreements that prospectively modify child-support obligations.
The only limitation to this well-established rule is that one cannot be permanently relieved from the obligation to support one's children so as to be immune from reimposition if future circumstances require. Levesque, supra. This limitation was recognized in Thompson v. Hove, 596 So.2d 939 (Ala.Civ.App.1992), where the Court of Civil Appeals stated, "An agreement, release, or judgment cannot permanently remove the obligation of a parent to provide support for a minor child if circumstances require it in the future." Id. at 940 (citing Tucker v. Tucker, 403 So.2d 262 (Ala.Civ.App.1981))(emphasis added). See also Hardy v. Hardy, 600 So.2d 1013, 1015 (Ala.Civ.App.1992)(citing Conradi v. Conradi, 567 So.2d 364 (Ala.Civ.App. 1990)); Quebedeaux v. Lord, 599 So.2d 51, 52 (Ala.Civ.App.1992)(citing Burrill v. Sturm, 490 So.2d 6 (Ala.Civ.App.1986)); Martin v. Martin, 494 So.2d 97 (Ala. Civ. App.1986); Tucker, 403 So.2d at 264 (citing *122 Moore v. Moore, 57 Ala.App. 735, 331 So.2d 742 (1976)); Womble v. Womble, 56 Ala.App. 318, 321 So.2d 660 (1975); Donald v. Donald, 50 Ala.App. 9, 276 So.2d 436 (1973).
In Love v. Love, 623 So.2d 315 (Ala.Civ. App.1993), the Court of Civil Appeals was presented with a situation similar to the one in the instant case. In Love, the parties had agreed that the noncustodial parent would not be required to provide child support, and, as in this case, that agreement was ratified by the trial court. Subsequently, the father, the custodial parent, petitioned the trial court to modify the prior decree and to impose support obligations on the mother, the noncustodial parent. The trial court denied the father's petition for modification. In affirming the trial court, the Court of Civil Appeals stated:
"It appears that the father first argues that the trial court erred in relying upon the parties' 1986 agreement that the mother would not be required to pay child support. A parent's support obligation to a minor child cannot be permanently removed by agreement, release, or judgment, if future circumstances require that support obligation. Thompson v. Hove, 596 So.2d 939 (Ala.Civ.App. 1992). When, however, the order establishing the amount of child support is based on an agreement between the parties, as in this case, `the decree should not be modified except for clear and sufficient reasons and after thorough consideration and investigation.' [Tucker v. Tucker, 588 So.2d 495, 497 (Ala.Civ. App.1991).] The record reveals nothing to indicate that the trial court was strictly bound by the 1986 agreement and that a modification could not have been granted, had the father proven a change in circumstances warranting such modification."
623 So.2d at 317.
This case does not present an instance in which Tabor or Buxton unilaterally or Tabor and Buxton bilaterally waived or altered Tabor's child-support obligation in contravention of a prior court order. As was the case in Love, supra, the parties' agreement was ratified by the trial court. We further note that the record does not reflect that Tabor owed any child-support arrearage before the 1993 order or the 1995 order. The 1993 order expressly found that "as of the time of the filing of the petition in this cause, neither party is indebted to the other party for child support." The trial court stated in its March 6, 2000, order that the previous orders had forgiven "the child support arrearage if any existed." (Emphasis added.) The trial court recited no proof of an arrearage that existed before the 1993 and 1995 orders, and in reviewing the record we have found no evidence showing that those orders "forgave" any child-support arrearage. Therefore, the previous orders were also not due to be set aside on this basis.[1] Further, the 1993 and 1995 orders prospectively modified child-support payments due from Tabor. As previously discussed, trial courts have the authority to modify future child-support payments. "[I]t is within the discretion of the trial court to modify the amount of child support due in the future ...." Frasemer, 578 So.2d at 1348.
The only judicially imposed limitation to this rule is that a child-support obligation cannot be waived permanently, *123 because future circumstances may require otherwise. Thompson, supra. Therefore, it was within the trial court's discretion to reinstate Tabor's child-support obligation to the parties' daughter. However, the trial court was not free to retroactively impose an obligation that had been previously and prospectively relieved by the orders of a prior court of competent jurisdiction.[2] In fact, Rule 32(A)(3)(a), Ala. R. Jud. Admin., specifically states that "[t]he provisions of any judgment respecting child support shall be modified only as to installments accruing after the filing of the petition for modification." (Emphasis added.) See also Grogan v. Grogan, 608 So.2d 397, 398 (Ala.Civ.App.1992)("It was within the discretion of the trial court to suspend the accrual of child support while Grogan is imprisoned.... The court, however, had no authority to give retroactive effect to its order.").
Based on the foregoing, we conclude that those portions of the trial court's March 6, 2000, order providing for a prospective support obligation from Tabor are due to be affirmed. However, we further conclude that there was no basis for the trial court to set aside its 1993 and 1995 orders. Those orders are valid, and the trial court erred in setting them aside. Accordingly, the Court of Civil Appeals' judgment affirming the trial court's March 6, 2000, and September 28, 2000, orders, insofar as those orders set aside the 1993 and 1995 orders and determined that Tabor owed an arrearage, respectively, is due to be reversed. Therefore, we remand this cause to the Court of Civil Appeals for it in turn to remand to the trial court to proceed in a manner consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, and WOODALL, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., concur in part and dissent in part.
STUART, J., concurs in the result and dissents from the rationale.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur in affirming the judgment of the trial court insofar as it prospectively modifies Tabor's child support and in reversing the trial court's order setting aside the trial court's prior orders. However, I respectfully dissent from affirming the trial court's award of postminority support under Ex parte Bayliss, 550 So.2d 986 (Ala.1989), because the father objected to and protested the trial court's award of postminority support
In 1989, this Court issued its opinion in Bayliss, supra, creating a postminority-support obligation and overruling a long line of Alabama cases, or portions thereof, that were in conflict with Bayliss. See English v. English, 510 So.2d 272 (Ala.Civ. App.1987), Bonham v. Bonham, 489 So.2d 578 (Ala.Civ.App.1985), Cain v. Cain, 452 So.2d 874 (Ala.Civ.App.1984), Wier v. Wier, 410 So.2d 78 (Ala.Civ.App.1982), Holmes v. Holmes, 410 So.2d 115 (Ala.Civ. App.1982), Ralls v. Ralls, 383 So.2d 857 (Ala.Civ.App.1980), Godec v. Godec, 346 So.2d 459 (Ala.Civ.App.1977), and Huckaba v. Huckaba, 336 So.2d 1363 (Ala.Civ. App.1976). The Court openly acknowledged that a postminority-support obligation was a "new rule," stating that "we are merely refusing to limit the word `children' *124 to minor children, because of what we perceive to be just and reasonable in 1989." 550 So.2d at 993 (emphasis added).
After recognizing the legal principle "stare decisis et not quieta movere," i.e., the legal principle of assuring certainty and predictability in law by adhering to precedent and not unsettling things that are established, this court proceeded to do just that, even admitting that "[b]y this opinion, we are unsettling things that have been established by the appellate court of this State." 550 So.2d at 994. The justification for such an action was that the "conscience and the feeling of justice of all those whose obedience is required by the rule on which the ratio decidendi of those prior decisions was logically based." 550 So.2d at 994. In fact, Bayliss made no pretense of following precedent.
"In making this holding, we are not the first by whom this new [rule] is tried, for we have cases from other jurisdictions, referred to by Justice Holmes as `the evening dress which the newcomer puts on to make itself presentable according to conventional requirements.'"
The few Alabama cases Bayliss relied upon do not support its result. In Bayliss, this Court relied heavily upon the rationale set forth in Ogle v. Ogle, 275 Ala. 483, 486, 156 So.2d 345, 348 (1963), which stated:
"`While there are divergent views on the question, it seems to us that the cases from other jurisdictions holding that a father may be required to contribute toward the college education of his minor child, who is in his mother's custody pursuant to a divorce decree, are supported by the better reasoning.'"
550 So.2d at 990. However, Bayliss seemed to focus primarily on the result, as opposed to the specific language, of Ogle because Ogle itself applied only to minors.
In this regard, Bayliss stated: "If the age of majority had remained 21 years, as it was from 1852 to 1975, Patrick would have been entitled to have his father contribute toward his college education, at least until March 5, 1991. But in 1975, the age of majority was reduced to 19 years in Alabama...." 550 So.2d at 991. Dissatisfied with the result, the Court in Bayliss reasoned that "`[t]here is no magic to the age of 21,'" Id., quoting New Jersey State Policemen's Benevolent Ass'n v. Town of Morristown, 65 N.J. 160, 169, 320 A.2d 465, 470 (1974), and then expanded the judicial interpretation of "minority" to include a select class of children who were, in fact, no longer minors.
But what the Court ultimately perceived to be "just and reasonable," guided by "conscience and the feeling of justice," did not justify a departure from the rightful role of judges so eloquently enunciated by Chief Justice John Marshall in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803): "[T]he province and duty of the judicial department [is] to say what the law is"not what it should be.
This established concept of judicial powers finds its impetus from the wisdom and guidance of Sir William Blackstone, who stated that a judge is sworn "to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one." 1 William Blackstone, Commentaries 69. Accordingly, the Constitution of Alabama of 1901 delegated the powers of government to three distinct departments: the legislative, the executive, and the judicial. Article III, § 43, Ala. Const.1901, states that "the judicial [department] shall never exercise the legislative and the executive powers, or either of them; to the end that it may be a government of laws and not of men." This *125 is the cornerstone of both our state and federal constitutional systems of government. Blackstone summarized this principle in 1765 when he stated:
"[P]ublic liberty ... cannot subsist long in any state, unless the administration of common justice be in some degree separated both from the legislative and also from the executive power. Were it joined with the legislative, the life, liberty, and property, of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law; which, though legislators may depart from, yet judges are bound to observe."
1 William Blackstone, Commentaries 259. Bayliss stated what the law should have been instead of what the law was; it thereby breached that separation of powers, creating a postminority-support obligation that had not previously existed in this State.
My criticism of the Bayliss decision is not limited solely to the grounds of stare decisis and the separation-of-powers doctrine; my concern extends to the breach of another even more fundamental relationship, i.e., the relationship between parent and child. Although Bayliss was well-intentioned and may have seemed right at the moment, it has resulted in a myriad of controversies between parties to a divorce, in the further alienation of affections between children and noncustodial parents, and in the creation of an entirely new body of law pursuant to which judges must assume the role of parents in assessing factors that are, at best, difficult to determine, e.g., the standard of living the child would have enjoyed had the parents not divorced and had the parents remained responsible for deciding the educational future of the child. The trial court is now required, in essence, to usurp the role, not only of the Legislature, but also of the parent, and to render a judgment on a purely hypothetical basis of what might have occurred in the future. The court is further required to assess the "child's commitment to, and aptitude for, the requested education," and it may consider "the child's relationship with his parent and the children's responsiveness to parental advice and guidance." 550 So.2d at 987.
Here, the child petitioning for Bayliss support has no relationship with her father, John Olyn Tabor, and in high school, she made A's, B's, C's, and D's. This case aptly illustrates the terrible burden Bayliss places upon a noncustodial parent. If the noncustodial parent wishes to defeat a court-imposed obligation, must he or she plead against his own child? Must the parent assert that the child has no commitment to academics or that the child lacks the requisite aptitude for college? Do we force the parent to argue that the child has maintained no relationship with the noncustodial parent or that he or she is a bad child, unwilling to follow parental advice? This type of proceeding invites resentment and further disruption of the parent/child relationship.
And what of the inequality? As a threshold matter, it must be recognized that children of divorce are not always deprived of parental support for higher education; likewise, children of families that remain intact are not always provided financial support for college. However, under Bayliss, parents of intact families can choose whether they wish to provide college expenses for their adult child, but parents who have divorced may not, and the choice is left to the courts.
Are not the courts invading an area that has been held dear to the hearts of parents, i.e., the right of the parent to decide how to educate their child? Some have even successfully argued that compelling *126 divorced parents to pay for their adult child's education violates equal-protection rights. Curtis v. Kline, 542 Pa. 249, 666 A.2d 265 (1995).
And what of the parents' recourse or control over an adult child? In an intact family, monetary support is very likely tied to acceptable behavior and passing grades. However, a noncustodial parent lacks both the "carrot" and the "stick." If a divorced parent is judicially obligated to pay for his or her child's higher education, the parent has no recourse, as would a parent in an intact family, to "make" the child comply with reasonable educational standards. An "adult child" may suddenly cut off all contact with the parent. The "adult child" may reject the parent's value system. The court, not the parent, may approve the college of choice for the "adult child." The child may make unsatisfactory grades or may otherwise refuse to "take his education seriously," and still, the "adult child" may collect his noncustodial parent's tuition money. And what is the noncustodial parent's only recourse? Hire a lawyer and seek a costly redress in the court system. This seems both impractical and unfair. Moreover, it seems to be a matter that presents a drain on the individuals involved as well as the courts. This system reduces a direct incentive for children to maintain both a civil (and accountable) relationship with the noncustodial parent, and without question, places a noncustodial parent at an unfair disadvantage.
A number of courts have sanctioned college-support payments for noncustodial parents, but almost universally the rationale for providing college expenses is much different from the rationale stated in Bayliss. For instance, some jurisdictions, like the District of Columbia, recognize, by statute, that a person up to the age of 21 years is a child for purposes of child support. Butler v. Butler, 496 A.2d 621, 622 (D.C.Ct.App.1985). Thus, college expenses, like any educational expenses incurred by a child, are a proper basis for ordering child-support payments.
However, other courts have properly refused to order postminority support absent some legislative mandate: Watson-Wojewski v. Wojewski, 617 N.W.2d 666 (S.D. 2000); Duncan v. Duncan, 556 So.2d 346 (Miss.1990) (holding that the obligation to pay college expenses ceases at majority, which is age 21 in Mississippi, even though the child may still be in college); Resong v. Vier, 157 Wis.2d 382, 459 N.W.2d 591 (Ct. App.1990) (holding the trial court erred by considering the child's post-high-school education in setting child support because the child would not be a minor); In re Marriage of Plummer, 735 P.2d 165 (Col. 1987); Grapin v. Grapin, 450 So.2d 853 (Fla.1984) (holding that the duty of a parent to provide for the college education of a child is a moral, rather than a legal, duty).
The State, by and through its elected judges, should not be the director of education for children. When the State interposes to determine when children should be entitled to receive "postminority-education support," according to the financial resources of the parents, as well as the relationship between the child and the parent, and the child's commitment to and aptitude for the requested education, the State is then put in the position of determining which child is entitled to receive support and which child is not. This, in essence, breaches a wall of separation between the State and the family that should be, and has been, ardently guarded throughout history.
The metes and bounds that separate each branch of government is of great importance, but that barrier that separates government from family is of even greater *127 importance and must be maintained if our rights are to remain secure. Our laws have long recognized the principle that the authority of a parent over a child is derived not from the State but from God. Recognition of this higher law, by which men are bound, is a fundamental precept of both the United States Constitution and the Constitution of the State of Alabama and it forms the basis upon which we possess recognized "inalienable" rights such as "life, liberty, and the pursuit of happiness." § 1, Art. I, Ala. Const. 1901. And where natural rights existed, commensurate duties, which were deemed natural, also existed. One of these duties was the natural duty of a parent to educate his or her child. Blackstone's Commentaries emphasized that
"[n]either do ... natural duties (such as, for instance, ... the maintenance of children ...) receive any stronger sanction from being also declared to be duties by the law of the land."
1 William Blackstone, Commentaries 54.
As early as 1765, Sir William Blackstone recognized the duty of parents to provide certain necessities for minor children, including shelter and education. However, a careful reading of Blackstone's Commentaries shows that a parent was not required to provide education throughout the entire period of minoritycertainly not a college education. 1 William Blackstone, Commentaries 434-41. Blackstone took note of the fact, for example, that many youths entered apprenticeships during their minority.
Moreover, Blackstone specifically recognized that the parents' obligation to provide education ended at the child's majority. "He [the father] may lawfully correct his child, being under age, in a reasonable manner; for this is for the benefit of his education." 1 William Blackstone, Commentaries 440 (footnote omitted; emphasis added). "The legal power of a father ... over the persons of his children ceases at the age of twenty one ... or that point which the law has established." 1 William Blackstone, Commentaries 441. Our Legislature has for many years required a parent to provide for a child's education only during the period of the child's minority and has recognized that parental responsibility, even in the absence of legislative or judicial enactment. In the case of Ex parte State ex rel. Summerlin, 634 So.2d 539 (Ala.1993), the Court specifically recognized the following fundamental principle: "`[T]here is always a duty of support by a parent even when the divorce decree gives custody to the mother and does not order support from the father.'" 634 So.2d at 542, quoting Northcutt v. Cleveland, 464 So.2d 112, 114 (Ala.Civ.App. 1985). This right was called "fundamental" and "inherent" and, as discussed in the main opinion, could not be waived, even by the agreement of the parent. This right is deemed to be a continuing right until the age of majority. 634 So.2d at 540. The Bayliss court wrongfully extended that age.
It is also interesting, if not highly instructive, to note that Bayliss used the example of King Solomon, whose task was to judge which of two women was the mother of a baby. Bayliss concluded that King Solomon was noted for his wisdom and for his judgment in a "child-custody case." But King Solomon was not faced with the dilemma of deciding custody as between two natural parents; rather, King Solomon's dilemma was the result of the criminal act of kidnapping. And, through his wisdom, King Solomon did not interfere with the parent/child relationship; on the contrary, he reaffirmed that relationship. If King Solomon had attempted to rule in the best interest of the minor child or in the public interest under the Bayliss *128 guidelines, he would have had to determine which woman had the greater aptitude, the more promising future, or the greater financial resources. He may well have given the child to the woman guilty of a criminal act without regard to the parent/child relationship. King Solomon was indeed a wise Kinghe recognized a fundamental principle of law and he did not attempt to make a new one.
Making law is the exclusive province of the Legislature and is political in nature. The Legislature must always look to the public interest or common good and determine the best or most effective means to attain that goal. The law may embody a pronouncement of something inherently right or good without reference to its proven good effect on the publice.g., laws against sodomy, incest, bigamy, and adulteryunder an operative assumption that doing what is right necessarily advances the common good. Such actions assume a moral order that man can know and promote through positive law. Another method of legislative decision-making involves projecting the outcome of alternative courses of action into the future to determine a desired result that may be neither inherently good nor inherently bad. Laws relative to taxation, speeding, zoning, and corporate affairs reflect this type of lawmaking. Legislators may resort to common or shared experiences to guide their judgment in an informal fashion or may even refer to systematic and comprehensive data collected and studied by experts to aid them in their decisions.
When a court begins to make rules for the public good, as it said it did in Bayliss, without reference to fundamental principles, it becomes a lawmaking body that has based its decision not on fundamental precepts of law, but rather upon a utilitarian methodology distinctively political in nature. Furthermore, when the court bases its opinions on the effects a rule will have on society in the future and not upon the particular facts of a case, it operates within a political realm reserved exclusively for legislative bodies.
Bayliss expressly took the position that there are three parties to every divorce action: the husband, the wife, and the public. It held that the interest of each must be weighed against the other in order to determine when the noncustodial parent will be required to provide postminority support. Specifically, Bayliss concluded that "the public occupies the position of a third party in a divorce action; and the court is bound to act for the public." 550 So.2d at 994. After reference to courts of other jurisdictions, the Bayliss Court concluded that "[t]his is the public policy of our State." 550 So.2d at 995. The Bayliss decision is wrong simply because judges are not authorized by law to determine public policy. Assuming that a college education is a necessity that may be enforced by law, and that the age of majority has no special significance, why should the rule protect only children of a divorce? Why not all children? And certainly the requirement in the divorce action that the child petition before he reaches the age of majority is arbitrary and capricious, treating children of the same parents disparately. The contradictions are endless. When does the obligation end? Does the requirement terminate with a college education, or does it continue through graduate school? Who decides such questions? And finally, are we willing to leave such decisions in the hands of judges whose decisions are shaped as much by their own feelings and ideologies as much as they are by the law? Perhaps in 2005 the feeling and sentiment of another court, acting for the benefit and welfare of the State, will further extend the postminority responsibility of the parent.
*129 Alabama has adopted the common law, as evidenced by § 1-3-1, Ala.Code 1975. That section states: "The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature." The Legislature has not authorized the holding in Bayliss. The rule of law is abandoned when the courts declare what the law should be based upon what is fair and just in 1819, 1989, or 2005. Courts are restricted to applying existing law to the particular facts of a case; they should not pronounce what the law should be, even if it is conventional and contemporary. That is not the role of the courts. By requiring a trial court to determine what degree of college education a minor child "would have had if their parents had not divorced," the Bayliss court required the trial courts of this State to enter into a prospective analysis of speculative facts and the application of a utilitarian methodology to proclaim what should be in the best interest of not only the child (who had become an adult under law) but in the best interest of the public as well.
It is axiomatic that there is an essential difference between the State and the family under our form of government. Each has a responsibility to govern within its sphere of authority. The State's power to govern, although encompassing a large population and extensive geographical area, is nonetheless limited in scope. As stated in the Constitution of Alabama 1901, "the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions, it is usurpation and oppression." Art. I, § 35, Ala. Const.1901.
The Bill of Rights to the United States Constitution stands for the proposition that all power does not reside with the federal or any state government. The Ninth Amendment to the United States Constitution specifically addresses rights "retained by the people." Similarly the Tenth Amendment to the United States Constitution reserves to the people certain powers not otherwise delegated to the United States by the Constitution nor prohibited by it to the States. The right of maintenance of one's children implies a duty that the court often addresses in equity proceedings. Nevertheless, when a child reaches majority, as that state is defined by law, a parent is relieved of any duty of maintenance, unless the child otherwise has a right to maintenance. Neither the United States Constitution nor the Alabama Constitution of 1901 gives the State the right to impose on parents a duty of postminority support.
As admitted in Bayliss, the requirement of postminority support clearly departed from precedent. But what of the precedent of Bayliss? Are we now bound by the last 12 years to recognize that parents have a duty of postminority support? Can we now make decisions retroactively? Even our present United States Supreme Court recognizes the principle of "retroactive decision-making" as described by Justice Scalia in Harper v. Virginia Department of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), as being a principal distinction between the judicial and legislative power. As Blackstone described, it is a fundamental principle that precedents should be followed:
"[P]recedents and rules must be followed, unless flatly absurd or unjust: for though their reason be not obvious at first view, yet we owe such a deference to former times as not to suppose they acted wholly without consideration."
*130 1 William Blackstone, Commentaries 70. This rule exists so that the scale of justice should be kept "even and steady, and not liable to waver [sic] with every new judge's opinion." 1 William Blackstone, Commentaries 69.
But when judges act without consideration, we are not bound by their "precedent." Blackstone would state that the rule of precedent does not always apply:
"Yet this rule [precedent] admits of exception, where the former determination is most evidently contrary to reason; much more if it be contrary to the divine law. But even in such cases the subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation. For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was bad law, but that it was not law ...."
1 William Blackstone, Commentaries 69-70. I have no doubt that Bayliss was well-intentioned. However, I believe it is time that this Court vindicate the law in Alabama as set forth by the Legislature. Here, the trial court relied upon Bayliss in ordering Tabor to pay two-thirds of his adult child's college tuition, books, and fees per semester. Because the father objected to these payments, and for the reasons set forth above, I would overrule Ex parte Bayliss and reverse the trial court's judgment awarding postminority support.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur, except that I dissent from the affirmance of any postminority "child" support.
STUART, Justice (concurring in the result and dissenting from the rationale).
I concur in the result reached in this case. Under the facts of this case the result is quite just. I write to express my concern that the majority opinion authorizes parents to agree that the noncustodial parent will pay no child support so long as a court ratified such an agreement. This is something Alabama courts should not do nor Alabama law permit.
NOTES
[1] For all that appears in the record, the arrearage that the trial court in its 2000 order determined Tabor owed was based on payments not made from 1993 to 2000payments that Tabor was not required to pay by virtue of the 1993 and 1995 orders that prospectively ordered that he was not required to pay child support.
[2] The personal jurisdiction and subject-matter jurisdiction of the trial court to render the 1993 and 1995 orders are undisputed.