BRYAN, Judge,
concurring specially.
I agree with the main opinion and I agree with the sentiments expressed by Judge Thomas in her special writing. I write specially to note my agreement with the following reasoning and sentiments expressed by Chief Justice Moore in his special writing in Ex parte Tabor, 840 So.2d 115, 123 (Ala.2002), regarding the constitutionality of Ex parte Bayliss, 550 So.2d 986 (Ala.1989):
“[Wjhat the [Bayliss ] Court ultimately perceived to be ‘just and reasonable,’ guided by ‘conscience and the feeling of justice,’ did not justify a departure from the rightful role of judges so eloquently enunciated by Chief Justice John Marshall in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803): ‘[T]he province and duty of the judicial department [is] to say what the law is’— not what it should be.
“This established concept of judicial powers finds its impetus from the wisdom and guidance of Sir William Blackstone, who stated that a judge is sworn ‘to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.’ 1 William Blackstone, Commentaries 69. Accordingly, the Constitution of Alabama of 1901 delegated the powers of government to three distinct departments: the legislative, the executive, and the judicial. Article III, § 43, Ala. Const.1901, states that ‘the judicial [department] shall never exercise the legislative and the executive powers, or either of them; to the end that it may be a government of laws and not of men.’ This is the cornerstone of both our state and federal constitutional systems of government. Blackstone summarized this principle in 1765 when he stated:
“ ‘[P]ublic liberty ... cannot subsist long in any state, unless the administration of common justice be in some degree separated both from the legislative and also from the executive power. Were it joined with the legislative, the life, liberty, and property, of the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law; which, though legislators may depart from, yet judges are bound to observe.’
“1 William Blackstone, Commentaries 259. Bayliss stated what the law should have been instead of what the law was; it thereby breached that separation of powers, creating a postminority-support obligation that had not previously existed in this State.
“My criticism of the Bayliss decision is not limited solely to the grounds of stare decisis and the separation-of-powers doctrine; my concern extends to the breach of another even more fundamental relationship, i.e., the relationship between parent and child. Although Bay-liss was well-intentioned and may have seemed right at the moment, it has resulted in a myriad of controversies between parties to a divorce, in the further alienation of affections between children and noncustodial parents, and in the creation of an entirely new body of law pursuant to which judges must assume the role of parents in assessing factors that are, at best, difficult to determine, e.g., the standard of living the child would have enjoyed had the parents not *55 divorced and had the parents remained responsible for deciding the educational future of the child. The trial court is now required, in essence, to usurp the role, not only of the Legislature, but also of the parent, and to render a judgment on a purely hypothetical basis of what might have occurred in the future. The court is further required to assess the ‘child’s commitment to, and aptitude for, the requested education,’ and it may consider ‘the child’s relationship with his parent and the children’s responsiveness to parental advice and guidance.’ 550 So.2d at 987.
“Here, the child petitioning for Bayliss support has no relationship with her father, John Olyn Tabor, and in high school, she made A’s, B’s, C’s, and D’s. This case aptly illustrates the terrible burden Bayliss places upon a noncustodial parent. If the noncustodial parent wishes to defeat a court-imposed obligation, must he or she plead against his own child? Must the parent assert that the child has no commitment to academics or that the child lacks the requisite aptitude for college? Do we force the parent to argue that the child has maintained no relationship with the noncustodial parent or that he or she is a bad child, unwilling to follow parental advice? This type of proceeding invites resentment and further disruption of the parent/child relationship.
“And what of the inequality? As a threshold matter, it must be recognized that children of divorce are not always deprived of parental support for higher education; likewise, children of families that remain intact are not always provided financial support for college. However, under Bayliss, parents of intact families can choose whether they wish to provide college expenses for their adult child, but parents who have divorced may not, and the choice is left to the courts.
“Are not the courts invading an area that has been held dear to the hearts of parents, i.e., the right of the parent to decide how to educate their child? Some have even successfully argued that compelling divorced parents to pay for their adult child’s education violates equal-protection rights. Curtis v. Kline, 542 Pa. 249, 666 A.2d 265 (1995).
“And what of the parents’ recourse or control over an adult child? In an intact family, monetary support is very likely tied to acceptable behavior and passing grades. However, a noncustodial parent lacks both the ‘carrot’ and the ‘stick.’ If a divorced parent is judicially obligated to pay for his or her child’s higher education, the parent has no recourse, as would a parent in an intact family, to ‘make’ the child comply with reasonable educational standards. An ‘adult child’ may suddenly cut off all contact with the parent. The ‘adult child’ may reject the parent’s value system. The court, not the parent, may approve the college of choice for the ‘adult child.’ The child may make unsatisfactory grades or may otherwise refuse to ‘take his education seriously,’ and still, the ‘adult child’ may collect his noncustodial parent’s tuition money. And what is the noncustodial parent’s only recourse? Hire a lawyer and seek a costly redress in the court system. This seems both impractical and unfair. Moreover, it seems to be a matter that presents a drain on the individuals involved as well as the courts. This system reduces a direct incentive for children to maintain both a civil (and accountable) relationship with the noncustodial parent, and without question, places a noncustodial parent at an unfair disadvantage.
[[Image here]]
*56 “The State, by and through its elected judges, should not be the director of education for children. When the State interposes to determine when children should be entitled to receive ‘postminority-education support,’ according to the financial resources of the parents, as well as the relationship between the child and the parent, and the child’s commitment to and aptitude for the requested education, the State is then put in the position of determining which child is entitled to receive support and which child is not. This, in essence, breaches a wall of separation between the State and the family that should be, and has been, ardently guarded throughout history.
“The metes and bounds that separate each branch of government is of great importance, but that barrier that separates government from family is of even greater importance and must be maintained if our rights are to remain secure. Our laws have long recognized the principle that the authority of a parent over a child is derived not from the State but from God. Recognition of this higher law, by which men are bound, is a fundamental precept of both the United States Constitution and the Constitution of the State of Alabama and it forms the basis upon which we possess recognized ‘inalienable’ rights such as ‘life, liberty, and the pursuit of happiness.’ § 1, Art. I, Ala. Const.1901. And where natural rights existed, commensurate duties, which were deemed natural, also existed. One of these duties was the natural duty of a parent to educate his or her child. Blackstone’s Commentaries emphasized that
“ ‘[njeither do ... natural duties (such as, for instance, ... the maintenance of children ...) receive any stronger sanction from being also declared to be duties by the law of the land.’
“1 William Blackstone, Commentaries 54.
“As early as 1765, Sir William Blackstone recognized the duty of parents to provide certain necessities for minor children, including shelter and education. However, a careful reading of Blackstone’s Commentaries shows that a parent was not required to provide education throughout the entire period of minority — certainly not a college education. 1 William Blackstone, Commentaries 434-41. Blackstone took note of the fact, for example, that many youths entered apprenticeships during their minority.
“Moreover, Blackstone specifically recognized that the parents’ obligation to provide education ended at the child’s majority. ‘He [the father] may lawfully correct his child, being under age, in a reasonable manner; for this is for the benefit of his education.’ 1 William Blackstone, Commentaries 440 (footnote omitted; emphasis added). ‘The legal power of a father ... over the persons of his children ceases at the age of twenty one ... or that point which the law has established.’ 1 William Blackstone, Commentaries 441. Our Legislature has for many years required a parent to provide for a child’s education only during the period of the child’s minority and has recognized that parental responsibility, even in the absence of legislative or judicial enactment. In the case of Ex •parte State ex rel. Summerlin, 634 So.2d 539 (Ala.1993), the Court specifically recognized the following fundamental principle: ‘ “[T]here is always a duty of support by a parent even when the divorce decree gives custody to the mother and does not order support from the father.” ’ 634 So.2d at 542, quoting Northcutt v. Cleveland, 464 So.2d 112, 114 (Ala.Civ.App.1985). This right was *57 called ‘fundamental’ and ‘inherent’ and, as discussed in the main opinion, could not be waived, even by the agreement of the parent. This right is deemed to be a continuing right until the age of majority. 634 So.2d at 540. The Bayliss court wrongfully extended that age.
“It is also interesting, if not highly instructive, to note that Bayliss used the example of King Solomon, whose task was to judge which of two women was the mother of a baby. Bayliss concluded that King Solomon was noted for his wisdom and for his judgment in a ‘child-custody case.’ But King Solomon was not faced with the dilemma of deciding custody as between two natural parents; rather, King Solomon’s dilemma was the result of the criminal act of kidnapping. And, through his wisdom, King Solomon did not interfere with the parent/child relationship; on the contrary, he reaffirmed that relationship. If King Solomon had attempted to rule in the best interest of the minor child or in the public interest under the Bayliss guidelines, he would have had to determine which woman had the greater aptitude, the more promising future, or the greater financial resources. He may well have given the child to the woman guilty of a criminal act without regard to the parent/child relationship. King Solomon was indeed a wise King — he recognized a fundamental principle of law and he did not attempt to make a new one.
“Making law is the exclusive province of the Legislature and is political in nature. The Legislature must always look to the public interest or common good and determine the best or most effective means to attain that goal. The law may embody a pronouncement of something inherently right or good without reference to its proven good effect on the public — e.g., laws against sodomy, incest, bigamy, and adultery — under an operative assumption that doing what is right necessarily advances the common good. Such actions assume a moral order that man can know and promote through positive law. Another method of legislative decision-making involves projecting the outcome of alternative courses of action into the future to determine a desired result that may be neither inherently good nor inherently bad. Laws relative to taxation, speeding, zoning, and corporate affairs reflect this type of lawmaking. Legislators may resort to common or shared experiences to guide their judgment in an informal fashion or may even refer to systematic and comprehensive data collected and studied by experts to aid them in their decisions.
“When a court begins to make rules for the public good, as it said it did in Bayliss, without reference to fundamental principles, it becomes a lawmaking body that has based its decision not on fundamental precepts of law, but rather upon a utilitarian methodology distinctively political in nature. Furthermore, when the court bases its opinions on the effects a rule will have on society in the future and not upon the particular facts of a case, it operates within a political realm reserved exclusively for legislative bodies.
“Bayliss expressly took the position that there are three parties to every divorce action: the husband, the wife, and the public. It held that the interest of each must be weighed against the other in order to determine when the noncustodial parent will be required to provide postminority support. Specifically, Bayliss concluded that ‘the public occupies the position of a third party in a divorce action; and the court is bound to act for the public.’ 550 So.2d at 994. After reference to courts of other juris *58 dictions, the Bayliss Court concluded that ‘[tjhis is the public policy of our State.’ 550 So.2d at 995. The Bayliss decision is wrong simply because judges are not authorized by law to determine public policy. Assuming that a college education is a necessity that may be enforced by law, and that the age of majority has no special significance, why should the rule protect only children of a divorce? Why not all children? And certainly the requirement in the divorce action that the child petition before he reaches the age of majority is arbitrary and capricious, treating children of the same parents disparately. The contradictions are endless. When does the obligation end? Does the requirement terminate with a college education, or does it continue through graduate school? Who decides such questions? And finally, are we willing to leave such decisions in the hands of judges whose decisions are shaped as much by their own feelings and ideologies as much as they are by the law? Perhaps in 2005 the feeling and sentiment of another court, acting for the benefit and welfare of the State, will further extend the postminority responsibility of the parent.
“Alabama has adopted the common law, as evidenced by § 1-3-1, Ala.Code 1975. That section states: ‘The common law of England, so far as it is not inconsistent with the Constitution, laws and institutions of this state, shall, together with such institutions and laws, be the rule of decisions, and shall continue in force, except as from time to time it may be altered or repealed by the Legislature.’ The Legislature has not authorized the holding in Bayliss. The rule of law is abandoned when the courts declare what the law should be based upon what is fair and just in 1819, 1989, or 2005. Courts are restricted to applying existing law to the particular facts of a case; they should not pronounce what the law should be, even if it is conventional and contemporary. That is not the role of the courts. By requiring a trial court to determine what degree of college education a minor child ‘would have had if their parents had not divorced,’ the Bayliss court required the trial courts of this State to enter into a prospective analysis of speculative facts and the application of a utilitarian methodology to proclaim what should be in the best interest of not only the child (who had become an adult under law) but in the best interest of the public as well.
“It is axiomatic that there is an essential difference between the State and the family under our form of government. Each has a responsibility to govern within its sphere of authority. The State’s power to govern, although encompassing a large population and extensive geographical area, is nonetheless limited in scope.”
840 So.2d at 124-29 (Moore, C.J., concurring in part and dissenting in part).
As noted by the main opinion, and as recognized by Judge Thomas in her special writing, I am bound to follow our supreme court’s decision in Bayliss. 145 So.3d at 49 (quoting TenEyck v. TenEyck, 885 So.2d 146, 158 (Ala.Civ.App.2003)). However, I, like Judge Thomas, urge the supreme court to take this opportunity to reconsider its decision in Bayliss.
THOMAS, J., concurs.