MOORE, Chief Justice
(concurring specially).
I write specially to provide further support for the Court’s reversal of Ex parte Bayliss, 550 So.2d 986 (Ala.1989). Specifically, as I explained in my special writing in Ex parte Tabor, 840 So.2d 115, 123-30 (Ala.2002) (Moore, C.J., concurring in part and dissenting in part), Bayliss violated (1) the separation-of-powers doctrine and (2) the fundamental rights of parents.

I. Separation of Powers

A. Redefining the term “child’’ is a legislative, not a judicial, function.

“[W]e do not subscribe to the doctrine that the judiciary can or should usurp the *73 legislative function in a republican form of government.” Hamilton v. Smith, 264 Ala. 199, 201, 86 So.2d 283, 285 (1956). The action of the Bayliss Court in changing the common-law rule that child-support obligations end at the age of majority was not a judicial act of applying existing law but was rather a legislative act of creating a new rule for future application. “ ‘[T]o declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative....”’ Sanders v. Cabaniss, 43 Ala. 173, 180 (1869) (quoting Thomas M. Cooley, Constitutional Limitations 91-95 (1868)). See also DeKalb Cnty. LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala.1998) (“[I]t is our job to say what the law is, not to say what it should be.”). The legislature, not the judiciary, has “special competency to make ... prospective general rules.” Ex parte Key, 890 So.2d 1056,1063 (Ala.2003).
By changing the common-law definition of “child,” the Bayliss Court not only misread § 30-3-1, Ala.Code 1975, and ignored § 1-3-1, Ala.Code 1975, but also violated the separation-of-powers doctrine by usurping the legislative function of making law. As Judge Thomas of the Court of Civil Appeals wrote: “I am concerned that the decision in Ex parte Bayliss violates the doctrine of the separation of powers because the decision encroached on the core function of our legislature — the power to make laws.” Christopher v. Christopher, 145 So.3d 42, 59 (Ala.Civ.App.2012) (Thomas, J., concurring specially). See also Joseph D. Ficquette, Post-Minority Educational Support: Good, Intentions Gone Terribly Awry, 4 Jones L. Rev. 73, 82 (2000) (“[T]he Supreme Court created new law to allow trial courts the jurisdiction to award and enforce post-minority educational support. This is a clear usurpation of legislative power given to the legislature in the state Constitution.”); TenEyck v. TenEyck, 885 So.2d 146, 158 (Ala.Civ.App.2003) (reversing a judgment denying an award of postminority educational support on the ground that Bay-liss “overstepped the constitutional] boundary between the legislature's] duty to make laws and the court’s duty to rule on those laws”).

B. The “conscience and feeling of justice” test is essentially legislative.

The Bayliss Court created an entitlement to postminority educational support “because of what we perceive to be just and reasonable in 1989.” 550 So.2d at 993. Rejecting the common law and statutory law, the Court also explicitly reversed eight previous appellate cases because “the ground or reason of those prior decisions by the Court of Civil Appeals would not be consented to today by the conscience and feeling of justice of all those whose obedience is required by the rule on which the ratio decidendi of those prior decisions was logically based.” Id. at 994.[8]
This curious language asserting a generic right to assess the “conscience and feeling of justice” of unascertained persons as a basis for judicial policy-making originated in a 1938 law-review article. See Rudolph Laun, Stare Decisis, 25 Va. L.Rev. 12, 22 (1938) (stating that a court is more likely to follow a rule of law from a prior case if “it corresponds to the feeling of justice of the population or that part of the population whose obedience is required by the rule involved in this ratio decidendi ”). In the months before Bayliss was decided, *74 the Justice who authored that opinion had adopted in special writings Laun’s “conscience and feeling of justice” test to decide whether to follow or to reject prior caselaw. See Lowman v. Piedmont Exec. Shirt Mfg. Co., 547 So.2d 90, 96 (Ala.1989) (Houston, J., concurring in part and dissenting in part and citing Laun); Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371, 385 (Ala.1989) (Houston, J., dissenting); Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1093 (Ala.1989) (Houston J., concurring specially and citing Laun).
In Bayliss, the “conscience and feeling of justice” test found majority support. Employing its own subjective assessment of the state of public opinion as a basis for judicial policy-making, the Court launched deeply into the legislative realm. Determining the current “conscience and feeling of justice” of the governed that would justify departure from settled law, however, surely is a legislative and not a judicial task. See Benjamin Cardozo, The Nature of the Judicial Process 141 (1921) (“[The judge] is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness.”). The Justice who authored Bayliss conceded that the Laun test was quite subjective:
“If I determine that the ratio decidendi — the underlying reason — for the rule of law would not hypothetically be consented to today by the conscience and the feeling of justice of the majority of all those whose obedience is required by that rule of law, then I will vote to change the rule of law. This test, of course, is not completely objective. There is a great deal of subjectivity in it. However, it is a standard that I use.”
Gorman Houston, Jr., Keynote Address to the Incoming Students at the University of Alabama School of Law, 18 J. Legal Prof. 5,13 (1993).
Professor Laun justified his “feelings” test for judicial innovation on the ground that judges were better lawmakers than legislators. “In consideration of the arbitrariness of many legislators who believe themselves to be legally omnipotent, it may with reason be claimed that judge-made law can be a much more adequate and stable form of law than statutes.” Laun, Stare Decisis, 25 Va. L.Rev. at 25. Laun’s preference for judicial lawmaking formed the philosophical basis of Bayliss and its malleable “conscience and feeling of justice” test.[9] Although the Court, employing the Laun test, felt itself free to write its own policy preferences into § 30-3-1, or any other statute,[10] the Alabama Constitution does not permit such liberties. “Great care must be exercised by the courts not to usurp the functions of other departments of government.” Finch v. State, 271 Ala. 499, 503,124 So.2d 825, 829 (1960) (citing Ala. Const.1901, Art. III, § 43). Among the myriad of judicial tests that have been devised over the years, surely the “feelings” test adopted in Bay-liss is one of the most unusual. Even if the feelings of Justices could form a basis for lawmaking, such a usurpation of the legislative function is undoubtedly unconstitutional. “In the government of this state ... the judicial [department] shall *75 never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.” Ala. Const.1901, Art. Ill, § 43.

C. Policy-making is a legislative function.

The “feeling of justice” test provided the Court a blank check to make or unmake law whenever it subjectively felt the public would approve of the change. Our system of constitutional government, however, expresses the popular will through electoral representation in the legislature, not through judicial assessment of the tide of public opinion. The determination of public policy as a basis for lawmaking is a legislative, not a judicial, function. Thus what this Court “perceive[d] to be just and reasonable in 1989,” Bayliss, 550 So.2d at 993, does not suffice to override or rewrite legislative policy to the contrary. “[T]he legislature, and not this Court, has the exclusive domain to formulate public policy in this state.” Boles v. Parris, 952 So.2d 364, 367 (Ala.2006). See also Cline v. Ashland, Inc., 970 So.2d 755, 758 (2007) (See, J., concurring specially) (“The Legislature is entrusted with making the public policy of this State, whether or not it is public policy of which this Court would approve.”); Beasley v. Bozeman, 294 Ala. 288, 290, 315 So.2d 570, 571 (1975) (“The Legislature’s power should not be interfered with unless it is exercised in a manner which plainly conflicts with some higher law.”); and Warren v. Alabama Farm Bureau Cotton Ass’n, 213 Ala. 61, 64, 104 So. 264, 267 (1925) (“When the Legislature ... speaks [in conformity with the Constitution], whether it be governed by age-old principle or by merely ephemeral expediency, it eliminates the question of public policy from the cognizance of courts in their administration of the legislative act.”). By forthrightly engaging in policy-making, the Bayliss Court exercised legislative power, an action expressly forbidden by Art. Ill, § 43, of the Alabama Constitution. See Finch v. State, 271 Ala. at 504, 124 So.2d at 830 (“[The judicial branch of government] is under restraint (§ 43, Constitution 1901) from imposing its methods or substituting its judgment for that of the executive and legislative branches of the government.”).[11]

D. The “Evening Dress” Metaphor.

After announcing the overruling of eight cases based on the “feelings” test, the Bayliss Court offered as further justification for its decision a sartorial metaphor:
“In making this holding, we are not the first by whom this new [rule] is tried, for we have cases from other jurisdictions, referred to by Justice Holmes as ‘the evening dress which the newcomer puts on to make itself presentable according to conventional requirements,’ Book Notice, 14 Am. L. Rev. 233-34 (1880).”
550 So.2d at 994. Holmes was not referring to cases from other jurisdictions but, instead, was referring to the realist philosophy that judges first decide the outcome of a case and then adorn it with legal reasoning (“the evening dress”) suitable to the result. He prefaced his “evening dress” remark with the statement: “The form of continuity [in the law] has been kept up by reasonings purporting to reduce everything to a logical sequence....” *76 Book Notice, 14 Am. L. Rev. at 234. Holmes also said, however, that he did “not expect or think it desirable that the judges should undertake to renovate the law. That is not their province.” Oliver Wendell Holmes, “Law in Science and Science in Law,” Collected Legal Papers 239 (1920). A former Alabama Supreme Court Justice offered a similar sentiment: “The temptation to weaken the separation of powers often comes in very appealing attire.” Harold F. See, The Separation of Powers and the Public Policy Role of the State Court in a Routine Case, 8 Tex. Rev. L. & Pol. 345, 352 (2004). The dazzling evening dress of policy innovation rightly belongs in the legislative, not the judicial, closet.

E. Misconstruing precedent to serve policy-making goals.

A further rationale of the Bayliss Court for requiring a noncustodial parent to provide postminority educational support was that the State was a necessary party to every divorce proceeding and thus could independently assert its own interests in custody and support decisions.
“While the rights of the parties to the divorce action must be fully respected, the public occupies the position of a third party in a divorce action; and the court is bound to act for the public. Flowers v. Flowers, 334 So.2d 856 (Ala. 1976); Hartigan v. Hartigan, 272 Ala. 67,128 So.2d 725 (1961); Ex parte Weissinger, 247 Ala. 113, 22 So.2d 510 (1945).”
550 So.2d at 994 (emphasis added). Building on this premise, the Court argued that parents have an obligation to educate their children for the benefit of the State. “ ‘ “It is a duty which the parent not only owes to his child, but to the state as well, since the stability of our government must depend upon a well-equipped, a well-trained, and well-educated citizenship.” ’ ” Id. (quoting Ogle v. Ogle, 275 Ala. 483, 487, 156 So.2d 345, 349 (1963), quoting in turn Pass v. Pass, 238 Miss. 449, 458, 118 So.2d 769, 773 (1960)).
The cases cited for the proposition that noncustodial parents have a legal obligation to make educational support payments “for the stability of our government” are inapposite. Flowers v. Flowers, 334 So.2d 856 (Ala.1976), indeed noted that in a divorce action “the court is bound to act for the public which is, in effect, a third party,” 334 So.2d at 858, and cited Hartigan v. Hartigan, 272 Ala. 67,128 So.2d 725 (1961), as its source. Hartigan similarly stated: “[SJuits [for divorce] are of a tripartite character, wherein the public occupies in effect the position of a third party, and the court is bound to act for the public.... ” 272 Ala. at 71, 128 So.2d at 728. Hartigan in turn relied on Ex parte Weissinger, 247 Ala. 113, 22 So.2d 510 (1945), which repeats the same statement about the public being a third party to a divorce action. 247 Ala. at 119, 22 So.2d at 515 (quoting Spafford v. Spafford, 199 Ala. 300, 308, 74 So. 354, 358 (1917)). None of these cases, however, identifies the nature of the public’s interest.
Weissinger further quoted from Spafford “ ‘that in cases of this character questions of mere legal niceties in regard to pleading should not interfere with the meritorious consideration of the cause,’ ” 247 Ala. at 119, 22 So.2d at 515, thus indicating that the referenced public interest may not be the furthering of “the stability of our government,” but instead a concern that the formalities of civil procedure not impede a just outcome of the proceeding. Spafford, in turn cited two cases for the proposition that the public is a third party to a divorce proceeding. In Wilkinson v. Wilkinson, 133 Ala. 381, 383, 32 So. 124, 124 (1902), the Court stated that the trier of fact may ex mero motu “direct an inqui *77 ry to ascertain the fact of the existence of a defense.” Thus, like in Spafford, the interest of the public in the matter is to ascertain the truth, even if the parties’ presentation of the facts is inadequate. In Wilkinson, the court on its own motion ordered a deposition of the wife. Again, “the stability of our government” does not seem to be the public interest at stake.
In Powell v. Powell, 80 Ala. 595, 1 So. 549 (1887), also cited in Spafford,, we finally arrive at the source of the public-interest rule and its underlying rationale. The Powell Court quoted from a family-law treatise the familiar statement that we have now traced back through 100 years of caselaw: “ ‘A divorce suit, while on its face a mere controversy between private parties of record, is, as truly viewed, a triangular proceeding, sui generis, wherein the public or government occupies in effect the position of a third party.’ ” 80 Ala. at 598, 1 So. at 550 (quoting 2 Joel Prentiss Bishop, Marriage and Divorce (1852)). After quoting Bishop, the Court quotes Ribet v. Ribet, 39 Ala. 348, 349 (1867), for the following statement: “ ‘The court is bound to act for the public in such cases, and so has the right to hear proofs not strictly within the allegations of the bill and answer.’ ” 80 Ala. at 598, 1 So. at 550. Thus, as in Spafford,, the Powell Court tied the public interest in a divorce case to the procedural discretion of the trial judge independently to develop the evidence. Such a rationale is a far cry from the stability-of-our-government logic of the Bayliss Court.
These 19th-century courts, reflective of the Christian culture that originally animated our institutions, placed these procedural considerations in the larger context of protecting the sanctity of the institution of marriage.
“The institution of marriage, established by divine, and perpetuated and guarded by human, authority, constitutes the foundation of organized society, protects private and public morality and virtue, and moulds the character of the citizens of the commonwealth. While an agreement to marry is regarded generally as a civil contract, by its consummation contractual relations of a special kind are formed, and the status of the parties, and their duties to each other and to the public, are ascertained and fixed. Extraordinary and exclusive personal relations are created, to continue so long as both parties may live; and public interests are involved in the strict and complete observance of the marital vows and covenants. The marriage relation can not be rescinded or annulled by the mere volition of the contracting parties. Its preservation is deemed so essential to the public weal that it can not be dissolved except by the sovereign power, or by a court of competent jurisdiction for causes prescribed by law, on sufficient allegations and satisfactory proof.
“The settled policy of the state, founded on these considerations, prohibits a divorce being granted by consent or collusion, or on the confessions of either or both of the parties, or for want of pleading or mispleading, or laches in making defense.”
Powell v. Powell, 80 Ala. at 597, 1 So. at 550. The view of marriage as a divine institution that may not be sundered for light, transient, or insubstantial reasons required the careful scrutiny of divorce eases by a trial court, not to serve the independent interests of the State, but to preserve the stability of the institution that “constitutes the foundation of organized society.”
The public interest in a divorce case was to preserve the institution of marriage by allowing its dissolution for only the weightiest reasons. Public policy in the 19th *78 century prohibited divorce on the whim of the parties. Mutual consent was insufficient. The trial court scrutinized the evidence to ensure that the grounds alleged were genuine and not merely collusive. The courts respected marriage vows and, unless powerful reasons compelled a different result, required the parties to observe them. The Powell Court continued:
“By the loose practice, too prevalent, and the facility with which divorces are sometimes obtained, the courts may be, in a measure, responsible for the extending want of a due appreciation of the sanctity of the marital relation. Whether or not defense be made, the court should feel bound by the highest considerations of duty and public policy to watch the interests of the community, otherwise undefended and unprotected. The appearance or indication of consent, express or implied, or of collusion, should stimulate the vigilance of the court, and a closer scrutiny of the evidence.”
80 Ala. at 598,1 So. at 550.
In Ribet v. Ribet, the Court further expounded on the community’s interest in preserving the marriage covenant.
“No one deserves to succeed in a suit to dissolve the bonds of marriage, that foundation upon which the whole framework of civilized society may be said to rest, who does not come into court without great blame; and it is the right and the duty of the court to be governed by the facts of the case going to establish its true character, no matter how they may be elicited. Bishop[12] says: ‘A maxim in these suits, therefore, is, that a cause is never concluded as against the judge; and the court may, and, to satisfy its conscience, sometimes does, of its own motion go into inquiry of matters not involved in the pleadings.’ ”
39 Ala. at 349-50. Responding to its high calling to defend marriage, the Court in Ribet refused a divorce to a husband and wife who were mutually guilty of violating their vows. “If both are guilty of such want of fidelity to their matrimonial vows, whether in one way or another, as goes to show that neither is strictly an ‘aggrieved’ party, the court will not disturb the binding force of that great bond of society, the marriage contract.” 39 Ala. at 350.
The preceding case history of the origins of the legal principle of a public interest in divorce proceedings shows that the statist concept attached to this hallowed history by the Bayliss Court misrepresented these precedents. The public interest in a divorce proceeding is not to further the interests of the State per se, as Bayliss claimed, but rather to safeguard the institution of marriage by ensuring that the parties fulfill their vows. Ribet and Powell do not stand for the proposition that the State as a third party has a right to compel parents to educate their children to serve the State, but rather that the government has an obligation to defend the “sanctity of the marital relation” from “loose practice” and easy divorce. The role of the court in acting for the public as a third party in a divorce action is to act independently of the parties, their pleadings, and evidence and to develop the case as needed to protect the institution of marriage — not to impose statist imperatives of higher education unrelated to preservation of the marital bond on families already reeling from divorce. By wrongly summoning an inapplicable principle of family law, the Bayliss Court distorted this Court’s precedents in service of its unwarranted excursion into legislative policy-making.

*79
II. The Fundamental Rights of Parents

By mistakenly interpreting this Court’s precedents to convert a principle intended to protect the sanctity of marriage into an instrument to serve State power, the Bay-liss Court also failed to observe the God-ordained jurisdictional boundaries between the State and the family recognized in our law. See, e.g., Powell, 80 Ala. at 597,1 So. at 550 (stating that marriage was established by divine authority). The health of civil society depends on an appropriate respect for those institutions that mediate between the individual and the State and provide the relational richness that gives life substance. Chief among these are the church and the family. Each has its own government and sphere of authority. See Ex parte G.C., 924 So.2d 651, 674-77 (Ala.2005) (Parker, J., dissenting). Compare Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331, 347-70 (2002) (Moore, C.J., dissenting) (examining respective jurisdictions of the church and the State).
Under Bayliss, the trial court, in deciding whether to order payment for postminority college expenses, assesses “the child’s commitment to, and aptitude for, the requested education” and may also consider “the child’s relationship with his parents and responsiveness to parental advice and guidance.” 550 So.2d at 987. These matters, which fall within the sphere of family government, are not suitable for judicial determination, despite the Bayliss Court’s ascription to trial courts of “the wisdom of Solomon in these domestic matters.” Id. at 995.
“The State, by and through its elected judges, should not be the director of education for children.... [T]he State is then put in the position of determining which child is entitled to receive support and which child is not. This, in essence, breaches a wall of separation between the State and the family that should be, and has been, ardently guarded throughout history.”
Ex parte Tabor, 840 So.2d at 126 (Moore, C.J., concurring in part and dissenting in part).
The Bayliss Court entered into a realm of internal family decision-making that has constitutionally been recognized as insulated from State intrusion. “The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.” Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). See also Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (“Simply because the decision of a parent is not agreeable to a child or because.it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.”); Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (“We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.”); Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (noting that “the Constitution protects the sanctity of the family”); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (“The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.”); Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (“[C]onstitutional interpretation has consistently recognized that the parents’ claim to authority in their own household *80 to direct the rearing of their children is basic in the structure of our society.”); Prince, v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (“It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.”); and Meyer v. Nebraska, 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (recognizing “the power of parents to control the education of their own”).
“This Court has also recognized the fundamental nature of parental rights.” Ex parte E.R.G., 73 So.3d 634, 643 (Ala.2011). See also Ex parte G.C., 924 So.2d at 661 (Stuart, J., concurring specially) (“Children are a gift from God.... Parents have God-given rights concerning their children, which are and should be protected by state government.” (footnote omitted)); K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003) (“The right to parent one’s child is a fundamental right....”). The Bayliss Court did not once refer to this line of precedent concerning “the private realm of family life which the state cannot enter.” Prince, 321 U.S. at 166.
Although parents who resort to the divorce courts voluntarily surrender a portion of their decision-making autonomy, that curtailment should be no greater than necessary to resolve the dispute at issue. Courts should be wary of further disturbing the residual affection and mutual sense of responsibility between parents that may yet survive the stress of divorce. Thus, arbitrarily intruding the State into parental decision-making, even after divorce, is unwarranted and is inconsistent with the recognition that “it is a natural parent, not the state, who has a fundamental right to the care, custody, and control of a child.” Meadows v. Meadows, 3 So.3d 221, 235 (Ala.Civ.App.2008) (Moore, J., concurring in the result).
The Bayliss Court, intent on creating an entitlement to the payment of college expenses for adult children of divorced parents, did not pause to consider the weighty precedents that limit the power of government to supersede parental authority. “The metes and bounds that separate each branch of government is of great importance, but that barrier that separates government from family is of even greater importance and must be maintained if our rights are to remain secure.” Ex parte Tabor, 840 So.2d at 126-27 (Moore, C.J., concurring in part and dissenting in part).

III. Conclusion

The assumption of legislative power by the Bayliss Court, coupled with its overreaching intrusion into the realm of parental decision-making, raises constitutional questions that underscore and complement this Court’s decision to overrule Bayliss and to reverse the decision of the Court of Civil Appeals.

. As examples of the overturned cases, see Cain v. Cain, 452 So.2d 874, 878 (Ala.Civ. App.1984) ("Absent a contract or disability, husband is not legally responsible for the support of his adult son.”); Godec v. Godec, 346 So.2d 459, 461 (Ala.Civ.App. 1977) ("[A] father is not required to support children who are no longer minors.”).

. Popular music has echoes of the Laun test. See Morris Albert, Feelings, on Feelings (RCA 1974) ("Feelings, nothing more than feelings .... ”).

. Post-Bayliss, the Laun test received favorable majority mention in other cases. See Prattville Mem’l Chapel v. Parker, 10 So.3d 546, 557-58 (Ala.2008); Ex parte First Alabama Bank, 883 So.2d 1236, 1245-46 (Ala. 2003); McCorkle v. McElwey, 576 So.2d 202, 206-07 (Ala. 1991); and Barnes v. Birmingham Int’l Raceway, 551 So.2d 929, 932-33 (Ala.1989).

. When the judiciary engages in policy-making, it not only violates the separation-of-powers doctrine, but also enfeebles the system of representative government. ”[W]hen this Court rushes in to remedy what it perceives to be the failings of the political processes, it deprives those processes of an opportunity to function. When the political institutions are not forced to exercise constitutionally allocated powers and responsibilities, those powers, like muscles not used, tend to atrophy.” Plyler v. Doe, 457 U.S. 202, 253, 102 S.Ct. 2382, 72 L.Ed.2d 786 (Burger, C.J., dissenting).

. Bishop on Marriage and Divorce § 314.